UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ANDREA MALONEY,                                          Index No.

                              Plaintiff,

        -against-                                        **VERIFIED COMPLAINT**

JP MORGAN CHASE & CO., and                              **JURY TRIAL DEMANDED**
PETER MULVEY,

                              Defendants.
-------------------------------------------------------------X


        Plaintiff, ANDREA MALONEY, by her Attorneys, Bisceglie & Associates, P.C.,

complaining of the Defendants, JP Morgan Chase & Co. and PETER MULVEY, alleges as

follows:

### JURISDICTION AND VENUE

        1)      Jurisdiction of this Court is pursuant to 28 U.S.C. §1331, and 28 U.S.C.

§1343(a)(3). This action is also brought pursuant to 42 U.S.C. section 1981, this being an action

brought by a citizen of the United States to redress the deprivation of rights, privileges and

immunities secured by the constitution and laws of the United States.


        2)      The court also has supplemental jurisdiction over Plaintiff's claims brought under

New York State Executive Law section 296 and New York City Administrative Code, section

8-107, et seq., and JP MORGAN CHASE & CO. qualifies as an employer both under Federal,

State and City laws, having in its employment more than 8 employees.

3)    Venue is proper in the Southern District of New York because the events complained of occurred within the Southern District of New York.

## PARTIES

4)    Plaintiff was an employee of JP Morgan Chase & Co since the Fall of 2005.

5)    She as employed in the Investment Bank, Technology & Market Strategies ("IB-TMS") division.

6)    Defendant JPMorgan Chase & Co. ("JPMorgan") is a financial services holding company and is one of the largest banking institutions in the United States and maintains its principal office at 270 Park Avenue, New York, NY, in addition to numerous global locations, including but not limited to offices in Atlanta, GA; Brooklyn, NY; Chicago, IL; Houston, TX; Jersey City, NJ; Lewisville, TX; Newark, NJ; Orem, UT; Stamford, CT; Tampa, FL; and Whippany, NJ.

7)    At all relevant times, JPMorgan has had 150 or more employees and held government contracts of $ 150,000 or more.

8)    As such, at all relevant times, JPMorgan has been a government contractor within the meaning of the Executive Order, and has been subject to the contractual obligations imposed on government contractors by the Executive Order and regulations issued pursuant thereto.

9)    At all relevant times, JPMorgan has been required to comply with the program requirements set forth in 41 C.F.R. SS 60-1.4(a), 60-2.17(b), and 60-2.17(d).

10)     At all relevant times, JPMorgan had in place an agreement for JPMorgan to establish affirmative action programs based on functional or business units pursuant to 41 C.F.R. S 60-2.1(d)(4). One such unit was identified as Investment Bank, Technology & Market Strategies ("IB-TMS").

## FACTS

11)     Plaintiff is a female.

12)     In the Fall of 2005, after nine (9) years being employed by Merrill Lynch, Plaintiff was hired as a Vice President in the Securitized Products Technology Division.

13)     In the Fall of 2009 Plaintiff participated in the annual Securitized Products Technology performance roundtable performance. This "roundtable" is for rating and ranking of Securitized Products Technology employees for their raises and bonus.

14)     At this discussion, a female's employee's maternity leave was discussed as a reason for a lesser rating.

15)     In approximately December of 2009 Plaintiff was Selected for a women's leadership program for high potential Vice President's in Technology and Operations for the Investment Bank.

16)     Plaintiff informed her manager, Peter Mulvey, of her selection into this program, he told me. "I don't believe in those special programs - those diversity programs. I believe I was a victim of what you Americans call 'reverse discrimination."

17)    Despite his lack of support and overt disdain for these types of programs, Plaintiff participated wholeheartedly.

18)    In January of 2010, Mrs. Maloney received her last raise, despite above average work performance and reviews.

19)    In July of 2010, Mrs. Maloney became pregnant with her first child, and because of the Fall 2009 maternity leave commentary regarding reduced someone's rating Plaintiff was concerned about informing her manager, Peter Mulvey, about her pregnancy.

20)    In October of 2010, still pregnant with my first child, she was invited to participate again in the Securitized Products Technology performance roundtable.

21)    Similar to the prior year's discussion, a peer of hers raised an employee's maternity leave as rationale for a reduced rating. Though Ana Cabrera Vargas from HR was there, Plaintiff defended the policy of not using someone's maternity against her in her performance rating by stating to the effect: "That information about her maternity leave is completely irrelevant." At which time, Ana Cabrera Vargas added, "Yes, Andrea is correct, that information is irrelevant."

22)    In December of 2010, Plaintiff was informed that her promotion to Executive Director was not approved, despite stellar reviews and having been given assurances that she was "on track" for the promotion.

4

23)     In June of 2011, at her mid-year performance review, Plaintiff was informed by her manager, Peter Mulvey, that she was again "on the radar for Executive Director promotion".

24)     In January of 2012, she was promoted to Executive Director but received no raise, being informed by Peter Mulvey that "a promotion doesn't mean a raise".

25)     In July 2012, Plaintiff informed Peter Mulvey, that she was pregnant with my second child.  Upon receiving the news, Mr. Mulvey expressed surprise and faltered over congratulations.

26)     Soon after Plaintiff informed her manager of her pregnancy, Hiren Vakharia, a close friend of Sanjeev Jain, her manager's manger, was hired by the firm and Plaintiff was directed to transfer one of her highest profile projects, the IB Flow Portal, to him.  The transfer was not due to inability or poor work.

27)     Again in January of 2013, she did not receive a raise, even after the

28)     In January of 2013 - Plaintiff gave birth to her second child, and took her twelve (12) week maternity leave.  Based on the comments during the Performance roundtable's, loss of one of her highest profile projects to a male, and fear of further retaliation, Plaintiff consistently stayed in touch with Peter Mulvey.  Plaintiff even came into the office during the leave, to attend an urgent meeting for a special project in March of 2013.

29)     Again in January 2013, Plaintiff did not receive a raise.

30)     In June of 2013, Plaintiff received her mid-year performance review from Peter Mulvey. At this review, Peter Mulvey referenced her maternity leave and that Plaintiff had taken "too much maternity leave in too short of time". Referring to have two children within three (3) years

31)     Extremely shocked and distressed by the review, Plaintiff sought guidance from Defendant's Department of Human Resources.

32)     She spoke with Christine Eckert and Ana Cabrera Vargas of Human Resources and was given to no resolution to her concerns.

33)     In June of 2013, the IB Flow Portal Project was returned to Plaintiff, uncompleted, as Hiren Vakharia transferred to a different position with the Defendant.

34)     In September of 2013, Plaintiff professionally confronted her manager about the lack of salary increase for past three (3) years while her peers, in a predominately male Department, had received raises and making more in salary and total compensation then she was. Her manager agreed that he would ensure a raise the following year.

35)     In January 2014, again despite above average reviews and work product, Plaintiff, once again, received no raise.

36)     When the Plaintiff complained to her manager, Peter Mulvey, he retorted: "You are lucky that he didn't pro-rate me [*her*] since you [*she*] were out on maternity leave."

6

37)    In a follow up discussion with Peter Mulvey in that same month he advised her that she was being compensated "at least $43,000 to $53,000 less" than males at her level and experience, but he didn't "know how to fix it."

38)    Plaintiff yet again contacted Anna Cabrera Vargas of the HR Department, to discuss the compensation and Peter Mulvey's comments with no resolution

39)    Later in 2014, Plaintiff contributed significantly to Peter Mulvey's main strategic project, the deployment of Latitude as the system for managing residential whole loans.

40)    As the project went on-line at the end of the year, Plaintiff expressed concerns to Peter Mulvey about the development team potentially encountering issues with the system in which he informed the Plaintiff "not to worry about it", as he had a "special agreement" with Rich Burton for the developers to have access if necessary to make changes.

41)    In the fall of 2014, Peter Mulvey would take Plaintiff's male peers on social events and excluded Plaintiff.

42)    When Plaintiff expressed concerns as to why she was excluded her per S.C. (initials of her peer) informed her that "Peter told him to be careful in telling her about when they were going out without her because she is sensitive about that."

43)     In January 2015, despite receiving an M+[1] rating and positive reviews specifically for delivering strategic projects, Plaintiff, once again, received no raise.

44)     In February 2015, Peter Mulvey informed the Plaintiff that he was making an external hire to fill the role for the LQV project and that he didn't know how to "grow me [Plaintiff]" anymore.

45)     He suggested that Plaintiff look at other roles internally and forwarded me a job description for an HR role.

46)     Despite Plaintiff's background as an engineer and programmer Peter Mulvey consistently advised Plaintiff that she wasn't "technical" though never made the same disparaging comments to any of her male counterparts "not technical" even though many of them, had the same background and experience as Plaintiff.

47)     In 2015, Plaintiff discovered that the Latitude Developers were accessing production data directly and making changes as needed using a "backend loophole.

48)     Plaintiff raised this issue repeatedly to her manager Peter Mulvey, and every time she was advised to "not to worry about it".

---

[1] M+ rating is equivalent to an exceptional rating.

49)     In July of 2015, Peter Mulvey was pleased that that one of the Plaintiff's female peers, R.Y., had resigned as he "had a backup plan in place already to put J.V. in charge of her and her project and now this made it easier."

50)     In December of 2015, Richard Brachman was transferred into Peter Mulvey's group and took over Latitude from my female peer.

51)     Subsequently in December of 2015, L.K. moved into the business manager position to replace Rich Burton and based on Plaintiff's experience Plaintiff requested the take over her main project, LQV.

52)     Despite being qualified for the position, Peter Mulvey advised her that "politically it would be difficult for me [*him*]".

53)     In January 2016, despite receiving positive reviews and better feedback and ratings from the developers, Plaintiff, once again, received no raise. In addition, her bonus was reduced.

54)     In January 2016 Developers on the Latitude team approached Plaintiff about their discomfort working for Richard Brachman.  Multiple developers informed Plaintiff of multiple instances where he threatened compensation and used bullying tactics in team meetings to intimidate them.

55)     In addition, Richard Brachman proudly bragged at the introductory team meeting that he is "not PC".

56)     In one instance when he was introduced to one of the female developers on the Latitude team and it was inquired whether he knew her, his answer was "Well not in the biblical sense."

57)     In early April 2016, Plaintiff was advised of a disturbing incident involving Richard Brachman. She discovered that in a team setting, with the majority of team members present, he made a joke about the most junior developer on the team, a female A.P., that he wanted to "smear chocolate up and down her thighs." This incident was verified by a male and female team member who was present, J.C. and T.L.

58)     On April 12, 2016, Plaintiff again met with Peter Mulvey to again discuss Richard Brachman's behavior. Peter agreed it was insensitive. I also told Peter about the comment made about "smearing chocolate up and down (Amrita's) thighs." He agreed that it was extremely serious and that he must raise to it with HR. Plaintiff never heard from HR.

59)     On May 3, 2016, Peter Mulvey advised Plaintiff: "Remember the conversation we had about Rich's comment?" He then told her that he decided to handle it directly without involvement of HR.

60)     Peter Mulvey informed Plaintiff that it was just a case of "foot in mouth," and the behavior would cease.

61)     A week later, Plaintiff personally read Richard Brachman belittle one of my developers in email and had heard him tell someone "Listen I want you to know I am not being a dick just to be a dick."

10

62)     In June of 2016, Plaintiff contacted JP Morgan Employee Assistance Program ("EAP") about the foregoing situation. She spoke with a counselor of that program, Judith Bess.

63)     During this telephone conversation, Plaintiff expressed fear of retaliation by Peter Mulvey and was informed that as a "whistle blower" she would be protected. Plaintiff was directed to contact HR.

64)     Upon contacting HR, Plaintiff was dismissed and was told to contact Employee Relations directly. She then spoke with Miriam De La Cruz of Employee Relations.

65)     Over two calls, Plaintiff provided the events to Ms. De Law Cruz and another employee of Employee Relations and was informed that the Plaintiff would be contacted prior to any contact with Peter Mulvey during the investigation.

66)     After approximately one (1) month, Plaintiff would follow up with Employee relations and told to "be patient".

67)     At end of July 2016 Plaintiff had a meeting with Employee Relations and was told that the chocolate statement wasn't sexual in nature but "body shaming" and that Plaintiff's compensation was "not at the bottom of the pay scale" without further elaborating.

68)     On August 24, 2016 her manager, Peter Mulvey informed her that her employment was going to be terminated on October 7, 2016 and to turn over all her project to three (3) male colleagues.

69)    When she contacted Employee Relations, she was advised that she was on the list for job elimination prior to August, but due to her complaint, they held off.

70)    Plaintiff last day employed by the Defendant was October 7, 2016.

## DISCRIMINATION IN COMPENSATION

71)    Pursuant to Section 202 of the Executive Order and 41 C.F.R. 60-1.4, JPMorgan has agreed not to discriminate against any employee because of race, color, religion, sex, or national origin and has agreed to take affirmative action to ensure that employees are treated during employment without regard to their race, color, religion, sex, or national origin.

72)    Since at least December 2009, JPMorgan has violated the Executive Order and regulations promulgated thereto in carrying out its government contracts by discriminating against female employees with regard to compensation.

73)    Since at least May 15, 2012, pay-deciding officials of JPMorgan have exercised discretion when setting compensation amounts for employees within Plaintiff's group and Plaintiff herself.

74)    In so doing, JPMorgan discriminated against me and against at least 93 females employed within the Group, by paying them less than comparable males employed in the same positions.

75)    This compensation disparity remains after adjusting for differences in legitimate compensation-determining factors.

76)     Upon information and belief, this failure continues to the present.

## FIRST CLAIM
### (Title VII Of The Civil Rights Act)

77)     Plaintiff repeats and realleges all of the allegations contained herein.

78)     Defendant has discriminated against Plaintiff with respect to the terms and conditions of employment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq., as amended by the Civil Rights Act of 1991.

79)     Defendant's conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiff under the law.

80)     By virtue of Defendant's conduct as alleged herein, Plaintiff has been injured.

81)     Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

## SECOND CLAIM
### (Retaliation In Violation Of Title VII Of The Civil Rights Act)

82)     Plaintiff repeats and realleges all of the allegations contained herein.

83)     Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under Title VII of the Civil Rights Act, 42 U.S.C §2000e-3(a).

84)     As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

85)     Defendant's acts and/or omissions were in direct retaliation for Plaintiff's complaints of discrimination on behalf of himself and others.

86)     Upon information and belief, Defendant's retaliatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling him to punitive damages under Title VII of the Civil Rights Act.

### THIRD CLAIM
**(Americans With Disabilities Act)**

87)     Plaintiff repeats and realleges all of the allegations contained herein.

88)     At all relevant times, Plaintiff was an "employee" of JPMorgan under Title

1, 42 U.S.C. 12101.

89)     By its actions detailed above, JPMorgan has unlawfully discriminated against Plaintiff on the basis of a disability in violation of 42 U.S.C. 121 12. Defendant's conduct toward Plaintiff constituted willful discrimination.

90)     Upon information and belief, JPMorgan was aware of the aforementioned discriminatory employment practices taken against Plaintiff, knowingly participated in such discriminatory practices and actions, and failed to take remedial action to correct these abuses.

14

91)    JPMorgan willfully engaged in the aforementioned discriminatory practices and acted with malice and/or reckless indifference to Plaintiff's rights under the ADA.

92)    Defendant's acts and/or omissions were in direct retaliation for Plaintiff's complaints of discrimination against JPMorgan.  Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

93)    As a result of Defendant's discrimination, Plaintiff suffered substantial damages, including lost wages and benefits, in an amount as yet undetermined.

### FOURTH CLAIM
**(Retaliation In Violation Of The Americans With Disabilities Act)**

94)    Plaintiff repeats and realleges all of the allegations contained herein.

95)    Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the ADA.

96)    JPMorgan retaliated against Plaintiff for having engaged in protected activity by, among other things, terminating his employment.

97)    Defendant's actions constitute retaliation against Plaintiff in violation of the ADA, 42 U.S.C. 12203.

98)    As a result of JPMorgan retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

99)    Upon information and belief, Defendant's retaliatory actions against Plaintiff were taken with reckless indifference to his rights, entitling him to punitive damages under the ADA.

### FIFTH CLAIM
### (Section 1981)

100)    Plaintiff repeats and realleges all of the allegations contained herein.

101)    Defendant's conduct towards Plaintiff constitutes an infringement of his right to make and enforce contracts in violation of Section 1981.

102)    As a result of Defendant's discriminatory conduct, Plaintiff has suffered substantial damages, including but not limited to back pay and reinstatement or front pay, other employment benefits, and damages for emotional pain, and mental anguish in amount to be determined at trial.

103)    Defendant's discriminatory conduct was taken with malice and/or reckless indifference to Plaintiff's rights. Plaintiff is therefore entitled to punitive damages.

104)    By reason of the foregoing, JPMorgan is also liable to Plaintiff for punitive damages, pre-judgment interest, attorneys' fees and costs.

### SIXTH CLAIM
### (Age Discrimination In Employment Act)

105)    Plaintiff repeats and realleges all of the allegations contained herein.

106)    By the conduct complained of above, Plaintiff has been deprived of equal employment opportunities and his status as an employee has been adversely affected because of his age.

107) By its conduct complained of above, JPMorgan engaged in unlawful employment practices in violation of Section 4(a)(l) of the ADEA, 29 U.S.C. 623(a)(l), by imposing discipline and then terminating Plaintiff from his job because of his age.

108) The unlawful practices complained of above were and are willful within the meaning of Section 7(b) of the ADEA, 29 U.S.C. 626(b).

109) As a result of Defendant's conduct described herein, Plaintiff was deprived of wages and benefits of employment.

110) Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

## SEVENTH CLAIM
### (Retaliation In Violation Of The Age Discrimination In Employment Act)

111) Plaintiff repeats and realleges all of the allegations contained herein.

112) Plaintiff opposed Defendant's unlawful, discriminatory employment practices under the Age Discrimination In Employment Act.

113) Defendant's retaliated against Plaintiff for having engaged in protected activity by, among other things, terminating his employment.

114) Defendant's acts and/or omissions were in direct retaliation for Plaintiff's complaints of discrimination against JPMorgan.

115) Defendant's actions constitute discrimination and retaliation against Plaintiff in violation of the Age Discrimination In Employment Act, 29 U.S.C. 626(d).

116) As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including lost wages and benefits and emotional distress, in an amount to be determined at trial.

117)   Upon information and belief, Defendant's retaliation was engaged in with malice and/or reckless indifference to Plaintiff's federally protected rights. Plaintiff's is therefore entitled to punitive damages under the ADEA.

## EIGHTH CLAIM
### (New York State Human Rights Law)

118)   Plaintiff repeats and realleges all of the allegations contained herein.

119)   At all relevant times, Plaintiff was an "employee" for purposes for 292 of the New York State Human Rights Law.

120)   By its actions detailed above, JPMorgan has unlawfully discriminated against Plaintiff on the basis of age, race, color, and disability, in violation of New York State Human Rights Law.

121)   Upon information and belief, Defendant's conduct toward Plaintiff constitutes willful discrimination.

122)   As a result of the willful discrimination described above, Plaintiff suffered substantial loss of earnings and benefits, and will continue to do so in the future. Accordingly, JPMorgan is liable to Plaintiff for both back pay and front pay or reinstatement in an amount as yet undetermined, damages for mental anguish, plus interest and costs.

## NINTH CLAIM
### (Retaliation In Violation Of The New York State Human Rights Law)

123)   Plaintiff repeats and realleges all of the allegations contained herein.

124)   Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity by, among other things, terminating his employment.

125)    Defendant's actions constitute retaliation against Plaintiff in violation of the New York State Human Rights Law, 296.

126)    As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

## TENTH CLAIM
**(New York City Human Rights Law)**

127)    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if separately set forth herein.

128)    Plaintiff is a "person" under 8-102(1) of the New York City Human Rights Law.

129)    Defendant is an "employer" for purposes of the New York City Human Rights Law under New York City Administrative Code 8-102(5).

130)    Defendant created a hostile work environment through a pattern of discriminatory treatment which included verbal harassment of Plaintiff.

131)    By its actions detailed above, JPMorgan has unlawfully discriminated against Plaintiff on the basis of race, color, age, and disability, in violation of the New York City Human Rights Law, 8-107(l)(a).

132)    As a result of Defendant's discrimination, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

133)     Defendant's discriminatory conduct was taken with reckless indifference to Plaintiff's rights, entitling him to punitive damages under the New York City Human Rights Law.

134)     As a result of Defendant's unlawful conduct, it is also liable for attorneys' fees and costs.

**ELEVENTH CLAIM**
**(Retaliation Under The New York City Human Rights Law, 8-107(7))**

135)     Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if separately set forth herein.

136)     Plaintiff opposed Defendant's unlawful, discriminatory employment practices and engaged in protected activity under the New York City Human Rights Law.

137)     Defendant retaliated against Plaintiff for having engaged in protected activity by, among other things, terminating his employment.

138)     Defendant's actions constitute retaliation against Plaintiff in violation of the New York City Human Rights Law, 8-107(7).

139)     As a result of Defendant's retaliation, Plaintiff has suffered substantial damages, including but not limited to mental distress and lost wages and benefits, in an amount to be determined at trial.

140)     Upon information and belief, Defendant's retaliatory actions against Plaintiff were taken with reckless indifference to Plaintiff's rights, entitling him to punitive damages under the New York City Human Rights Law.

141)    Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

## TWELFTH CLAIM
### (Interference With Protected Rights Under
### The New York City Human Rights Law, 8-107(19))

142)    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

143)    Defendant's actions set forth above violated 8-107(19), which sets forth that:

Interference with protected rights. It shall be an unlawful discriminatory practice for any person to coerce, intimidate, threaten or interfere with, or attempt to coerce, intimidate, threaten or interfere with, any person in the exercise or enjoyment of, or on account of his or her having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected pursuant to this section.

144)    Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

## THIRTEENTH CLAIM
### (Aiding And Abetting Under
### The New York City Human Rights Law, 8-107(6))

145)    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

146)    Defendant's actions set forth above violated 8-107(6), which sets forth that:

It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so.

147)   Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

### AS FOR A FOURTEENTH CAUSE OF ACTION

**(Defendant Is Liable Under
The New York City Human Rights Law, §8-107 (13)(b))**

148)   Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

149)   By the actions set forth above, Defendant is liable under 8-107(13)(b) which sets forth that:

> An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section where:
>
> (1)   The employee or agent exercised managerial or supervisory responsibility;
>
> (2)   The employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
>
> (3)   The employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

22

150)    At the time of Plaintiff's employment with JPMorgan ended, Peter Mulvey, and all other named or initialed individuals as named above were an "employees" and "agents" of Defendant.

151)    At the time of Plaintiff's employment with JPMorgan ended, Peter Mulvey exercised managerial or supervisory responsibility for Defendant.

152)    By their actions and conduct set forth above, Peter Mulvey, Richard Brachman, and other management/supervisory engaged in unlawful discriminatory practices.

153)    Defendant should have known of the discriminatory conduct of Richard Brachman and Peter Mulvey.

154)    Defendant knew of the discriminatory conduct of Richard Brachman and Peter Mulvey, and acquiesced in such conduct and failed to take immediate and appropriate corrective action.

155)    Defendant failed to exercise reasonable diligence to prevent the discriminatory conduct of Richard Brachman and Peter Mulvey taken against Plaintiff.

156)    Defendant is liable for the actions and conduct of Peter Mulvey and Richard Brachman.

157)    Plaintiff has sustained, and will continue to sustain, loss of earnings and other financial damages and has suffered, and continues to suffer, mental anguish.

## AS FOR A FIFTEENTH CAUSE OF ACTION
### (Defendant Is Liable Under
### The Family and Medical Leave Act 29 U.S.C.A. § 2601 et seq.)

158)    Plaintiff repeats and realleges all of the allegations contained in this Complaint, as if separately set forth herein.

159)    At all relevant times, Plaintiff was an "employee" for purposes of the Family and Medical Leave Act 29 U.S.C.A. § 2601 et seq ("FMLA").

160)    By its actions detailed above, JPMorgan has unlawfully discriminated against Plaintiff on the basis of utilizing her rights under the FMLA, in violation of Federal and State Law.

161)    Upon information and belief, Defendant's conduct toward Plaintiff constitutes willful discrimination based on the FMLA.

162)    As a result of the willful discrimination described above, Plaintiff was denied her rights under the FMLA, thereby suffering extreme emotional distress, substantial loss of earnings and benefits, and will continue to do so in the future. Accordingly, JPMorgan is liable to Plaintiff for both back pay and front pay in an amount as yet undetermined, damages for mental anguish, plus interest and costs.

WHEREFORE, plaintiffs demand judgment against defendants on the for an amount yet to be determined in excess of the Courts minimal jurisdiction amount, together with appropriate interest, if applicable, costs and disbursements of this action and for such other and further relief which this Court may deem just and proper.

Dated:  May 5, 2017

Bisceglie & Associates, P.C.

By: Peter Iannace, Esq. (9900)

## VERIFICATION

STATE OF FLORIDA    )
                         ) ss.:
COUNTY OF WALTON   )

      ANDREA MALONEY, being duly sworn deposes and says:

      I am one of the plaintiffs in this action. I have read the foregoing Verified Complaint and the same is true to the best of my knowledge and belief except as to matters alleged on information and belief which, as to those matters, I believe them to be true.

                                          Andrea Maloney

Sworn to before me this
_27_ day of April, 2017.

Notary Public

JOAN M ELLIS
Notary Public - State of Florida
Commission # FF 956593
My Comm. Expires May 11, 2020
Bonded through National Notary Assn.